**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

FILED by ___VT___ D.C.
ELECTRONIC

**April 20, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

R.J.                                            :
                                                :
                                                :
                                                :
            **Plaintiff,**                      :
**vs.**                                         :   **CASE NO.**
                                                :
ANDREA AZIA a/k/a ANDREA ASIA, individually :   **09-CV-21043-Seitz-O'Sullivan**
EFRAM ROBERTS, individually;                    :
MARIA GONZALEZ, individually;                   :
KISMA CALLWOOD, individually;                   :
DELSA CHIN, individually;                       :
BEN GALLOSO, individually;                      :
PABLO I. LOPEZ, individually;                   :
MARK A. JOHNSON, individually;                  :
DIANA GARCES, individually;                     :
GEORGIE LATANNE, individually;                  :
WINNIEFRED RAMSEY, individually                 :
                                                :
                                                :
            **Defendants.**                     :
_____/

## COMPLAINT

Plaintiff, R.J, hereby sues the Defendants, ANDREA AZIA a/k/a ANDREA ASIA,

EFRAM ROBERTS, MARIA GONZALEZ, KISMA CALLWOOD, DELSA CHIN, BEN

GALLOSO, PABLO I. LOPEZ, MARK A. JOHNSON, DIANA GARCES, GEORGIE

LATANNE, and WINNIEFRED RAMSEY and in support thereof states as follows:

### PRELIMINARY ALLEGATIONS

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331.

2.      This action arises under and is brought pursuant to 42 U.S.C §1983 to remedy the

deprivation under color of state law, of rights guaranteed by the Fourteenth Amendment to the

United States Constitution.

3.     This case is brought by a former foster child, R.J., who, at age three, was taken into DCF custody. Once in DCF custody R.J. instead of being offered stable consistent care, was repeatedly abused  by her caretakers,  was subjected to over 40 changes in placement, was not placed in therapeutic foster homes despite the professional judgment of those treating her mental health issues that she should be as they watched her condition rapidly deteriorate , and as a result was placed in a series of locked facilities in which she was still further abused.

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331.

5.     This cause of action arose in the Southern District of Florida.  Therefore, venue is proper under 28 U.S.C. §1391(b).

## THE PARTIES

6.     Plaintiff, R.J., at all times relevant hereto, was a minor (date of birth April 21, 1987) in the legal and physical custody of the State of Florida Department of Children and Family Services (hereinafter "DCF") and resided in Miami Dade County, Florida.

7.     Due to Plaintiff R.J.'s status as a minor at all times relevant to the complaint and the serious nature of the abuse she suffered, R.J. files this action using a pseudonym.

8.     At times relevant hereto, Defendant, ANDREA AZIA a/k/a ANDREA ASIA(hereinafter "AZIA") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

9.     At all times relevant hereto, Defendant AZIA was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

10.     As a foster care caseworker, Defendant AZIA had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home

2

in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

11.    At all times relevant, Defendant AZIA had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. Defendant AZIA is being sued in her individual capacity.

12.    At times relevant hereto, Defendant, EFRAM ROBERTS (hereinafter "ROBERTS") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

13.    At all times relevant hereto, Defendant ROBERTS was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

14.    As a foster care caseworker, Defendant ROBERTS had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the

3

adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

15.     At all times relevant, Defendant ROBERTS had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.  Defendant ROBERTS is being sued in his individual capacity.

16.     At times relevant hereto, Defendant, MARIA GONZALEZ (hereinafter "GONZALEZ") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

17.     At all times relevant hereto, Defendant GONZALEZ was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

18.     As a foster care caseworker, Defendant GONZALEZ had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

19.     At all times relevant, Defendant GONZALEZ had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. Defendant GONZALEZ is being sued in her individual capacity.

20.     At times relevant hereto, Defendant, KISMA CALLWOOD (hereinafter "CALLWOOD") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

21.     At all times relevant hereto, Defendant CALLWOOD was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

22.     As a foster care caseworker, Defendant CALLWOOD had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

23.     At all times relevant, Defendant CALLWOOD had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. Defendant CALLWOOD is being sued in her individual capacity.

24.     At times relevant hereto, Defendant, DELSA CHIN (hereinafter "CHIN") was an

agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

25.    At all times relevant hereto, Defendant CHIN was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

26.    As a foster care caseworker, Defendant CHIN had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

27.    At all times relevant, Defendant CHIN had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.  Defendant CHIN is being sued in her individual capacity.

28.    At times relevant hereto, Defendant, BEN GALLOSO (hereinafter "GALLOSO") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case. At all times relevant hereto, Defendant GALLOSO was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

29.    As a foster care caseworker, Defendant GALLOSO had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the

6

foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

30.     At all times relevant, Defendant GALLOSO had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.  Defendant GALLOSO is being sued in his individual capacity.

31.     At times relevant hereto, Defendant, PABLO I. LOPEZ (hereinafter "LOPEZ") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

32.     At all times relevant hereto, Defendant LOPEZ was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

33.     As a foster care caseworker, Defendant LOPEZ had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for

7

evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

34.     At all times relevant, Defendant LOPEZ had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.  Defendant LOPEZ is being sued in his individual capacity.

35.     At times relevant hereto, Defendant, MARK A. JOHNSON (hereinafter "JOHNSON") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

36.     At all times relevant hereto, Defendant JOHNSON was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

37.     As a foster care caseworker, Defendant JOHNSON had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

38.     At all times relevant, Defendant JOHNSON had the ability, authority, and the

means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. Defendant JOHNSON is being sued in his individual capacity.

39.    At times relevant hereto, Defendant, DIANA GARCES (hereinafter "GARCES") was an agent and/or employee of DCF, acting as a caseworker assigned to R.J.'s case.

40.    At all times relevant hereto, Defendant GARCES was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

41.    As a foster care caseworker, Defendant GARCES had the authority and responsibility to: 1) evaluate all reports of child abuse and/or neglect on the subject child and the foster home in which she was placed; 2) visit children in foster home placements in accordance with the requirements for children in shelter status or dependent custody; 3) to investigate all relevant conditions of the home that might affect the child in her caseload or other children in the home; 4) report any violations of the home's operating license; 5) continually assess the adequacy and safety of a child's particular placement; 6) make appropriate referrals for evaluations or services including referrals to psychologists, psychiatrists, general medical doctors, and the SATC; and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual, emotional, and physical abuse.

42.    At all times relevant, Defendant GARCES had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. Defendant GARCES is being sued in her individual capacity.

43.    At times relevant hereto, Defendant, GEORGIE LATANNE (hereinafter "LATANNE") was an agent and/or employee of DCF, acting as the supervisor of placement of children in the care and custody of DCF, including R.J..

44.    As a placement unit supervisor, Defendant LATTANE had the authority and responsibility to: 1) assess, screen, and evaluate foster parents and ensure that children were in safe placements and were not subjected to unreasonable risk of harm by other foster children as a result of inappropriate foster home population, (2) ensure that waivers for overcapacity were issued in accordance with applicable state statutes, administrative rules, and applicable departmental regulations, (3) recommend approval or denial of exceptions to licensed capacity when the physical characteristics and the combination of children in the home posed a substantial risk of harm to the children placed there; (4) ensure that children are not placed in family foster homes at a time when there were open abuse investigations or foster home concerns; (5) obtain accurate and timely written information about the background of children for whom protective investigators and/or family service counselors were requesting placement,; (6) ensure that children were not left in dangerously overcrowded foster homes where they were subjected to physical, emotional, and sexual abuse; and (7) ensure that children who posed a known substantial risk of harming other children were not placed in situations where they were in a position to harm other children.

45.    At all times relevant, Defendant LATTANE had the ability, authority, and the means to recommend disapproval of foster home placement in which there was a substantial risk of serious harm and to recommend the removal of any child from an unsafe placement.  She is being sued in her individual capacity.

46.    Defendant, WINNIEFRED RAMSEY, was a Child Protective Investigator employed by the Department, who, at times relevant hereto, investigated abuse allegations by R.J. that she was sexually abused while at CATS. At all times relevant hereto Defendant RAMSEY was obligated to comply with all state and federal laws and regulations as well as

10

departmental/district procedures regarding children in state care.

47.     As a Child Protective Investigator, RAMSEY had the authority and responsibility to: 1) investigate reports of child abuse and/or neglect in accordance with professional child welfare standards and DCF requirements, including but not limited to reviewing and evaluating all prior reports of abuse and neglect; 2) affording children in foster care the same level of protection from physical and sexual abuse as children and families under investigation in the community; 3) properly evaluating the risk of leaving a vulnerable child of tender years in a placement with a history of sexual abuse allegations reported by individuals unknown to the subject child or to one another; 4) conducting a proper investigation of all relevant conditions of the placement that might affect the safety and well being of children in the placement; 5) reporting any violations of the placement's operating license, 6) make appropriate referrals for evaluations or services including referrals to the Sexual Assault Treatment Center ("SATC") and/or the Child Protection Team ("CPT"); and 7) ensure that foster children were not left in dangerous conditions, including being subjected to sexual abuse.

48.     At all times relevant hereto, Defendant RAMSEY had the ability, authority and the means to remove a child from a placement in which there was a substantial risk of serious harm to the child. She is being sued in his individual capacity.

## GENERAL FACTUAL ALLEGATIONS

49.     The State of Florida removed R.J. from her biological mother on March 7, 1990, at only three years of age. Despite terminating her parents' rights, the State deprived R.J. of any opportunity to have a permanent family. R.J. lost her entire childhood due to being confined in the State foster care system for an astonishing fifteen years.

50.     From the age of three, when R.J. first entered the system, it was recognized that

11

she was in need of a therapeutic placement. Despite numerous reports repeatedly documenting her need for a stable, therapeutic home, Defendant's failed to place R.J. in an appropriate setting as defendants watched her be abused and deteriorate emotionally.

51. She was shuffled from foster home to group home to residential facility, one after the other and never placed in an appropriate or therapeutic foster home.

52. She spent less than one day in an appropriate therapeutic home before DCF had to move her as a result of its own deliberate indifference to R.J.'s safety and well-being. The State changed her placement in excess of forty (40) times, causing R.J. to be disrupted from any stability, and leaving her unable to experience life in a permanent home.

53. With each devastating move, Defendant's acted with knowledge of R.J.'S need for a specialized setting but continuously failed to take appropriate measures to secure a proper home. As a result of Defendant's deliberate ignorance to R.J.'S needs, she suffered years of physical abuse, sexual abuse, psychological abuse, and neglect in the foster care system. Sadly, R.J.'s eight (8) siblings share a similar story.

54. The court adjudicated R.J. dependent on June 7, 1990; however, it took DCF almost five years to file a petition for termination of parental rights. It was another three (3) years before the order was finally granted.

55. Furthermore, the State did not even bother to place R.J. on the State adoption registry until May 7, 1999, more than nine (9) years after she first came into care and almost a year after the termination of parental rights order was granted.

56. A beautiful three year old toddler when she entered the system, R.J. was already twelve (12) years of age and rapidly deteriorating by the time Defendants got around to seeking any type of permanent home for her.

12

57.     R.J. was subjected to years of physical and sexual abuse, neglect, and bizarre punishment while under DCF's care and custody. In her longest placement with Irene Burgess, where she was placed and removed three (3) separate times, and where she spent the better part of nine (9) years, she was repeatedly threatened, beaten, deprived of food, and subjected to bizarre punishment.

58.     She was often forced to stand outside in the pouring rain, cold, or sweltering heat for hours on end as a form of punishment. On one occasion when R.J. got in trouble at school, Mrs. Burgess drug her outside, threw her onto the concrete pavement causing a laceration to her face and cuts to her hands, and forced her to stand outside in the pouring rain for almost three hours. She was treated like the dog, forced to sleep outside on at least one occasion as punishment for reading or talking. She began to read as an escape, but Mrs. Burgess would not allow this, so R.J. would have to try to read at night through the light coming in through the blinds, while she was supposed to be asleep.

59.     R.J. was frequently beaten with hands, hangers, brooms, shoes, and other objects, often resulting in bruises and welts. Other forms of punishment included being forced to stand in the fireplace bent over for hours at a time, having to stand on one leg in the corner while holding books in one hand, having to stand with both hands at shoulder level, and having Clorox bleach poured on her while bathing. She was often dragged out of bed, sometimes from the top bunk, and thrown onto the floor if she didn't wake up when told.

60.     R.J. is still traumatized today by this experience, having frequent nightmares of falling into a pit and going straight to hell. R.J. and her siblings were forced to spend almost all of their time on the back patio and would have to get permission to use the restroom. She was so fearful of having to get permission that she began to hold her urine. This is something that she

13

continues to do to this day, and as a result she has suffered several kidney infections.

61.     R.J. reported this ongoing abuse and bizarre punishment which resulted in her removal from the home on several occasions.  However, despite numerous abuse reports, often with at least some indicators, Defendants continued to return her back to the Burgess home only to suffer more abuse and neglect.  She was removed from the Burgess' and placed back there on three separate occasions.

62.     When placed in residential treatment facilities, R.J. was repeatedly sexually abused.  Despite reporting sexual abuse by an adult staff member at one facility, Defendants failed to change R.J.'s placement or limit the staff member's contact with her, leaving her to be further victimized.  In 2000, at the age of thirteen, she was raped and infected with an incurable sexually transmitted disease.

63.     The acts of omission and commission complained of, resulting in violation of Plaintiff's civil rights, were a continuing tort, extending from the time Plaintiff entered the foster care system in 1990 through the time that she aged out of the foster care system, on April 21, 2005.

64.     Throughout the period of time in which Plaintiff was in the care and custody of the State of Florida, Department of Children and Families, there was no person available and in a position to protect Plaintiff other than those violating her civil rights.

65.     Additionally, Plaintiff did not have knowledge of the individuals against whom she may have a cause of action because she was unable to get her foster care records.

66.     At the time R.J. aged out of the foster care system, she made multiple oral requests for copies of her foster care file.

67.     Despite its operating procedure, entitling foster children to one free copy of their

14

foster care file, DCF refused to provide R.J. with same.

68.     R.J. again requested her records in or about October, 2008.

69.     However, it was not until counsel became involved in this case in February 2009, that DCF finally began producing records.

70.     As of the date of this complaint, DCF still has not provided the undersigned with several years' worth of R.J.'s records.

71.     As such, R.J. remains unable to identify all of her potential claims.

72.     DCF is the state agency charged with operating the state foster care system and providing substitute care services to children placed in its care through the Children and Families Program.   DCF is organized into 15 districts each of which is responsible for caring for dependent children in a specific geographic catchment area.   District 11 is the subdivision of DCF, which administers the child protection and foster care system in Miami Dade County, Florida.

73.     DCF is also the state agency charged with operating the state system that oversees the administration of mental health care and services to, *inter alia*, dependent children placed in its care, through ADM.   District 11 is the subdivision of DCF that administers the ADM program in Miami Dade County, Florida.

74.     At all times relevant, DCF was charged with providing children in its custody with safe, stable, shelter and foster home placements, with the ultimate goal of family reunification and if that was not possible, adoption, and if that was not possible, long term stable placements.

75.     However, after R.J. deteriorated emotionally from her abuse in care, children in the custody of DCF who had mental health issues, including Plaintiff, R.J., were to be placed in the

least restrictive environment.

76. Least restrictive environment is defined as the place where "the treatment and conditions of treatment that, separately and in combination, are no more intrusive or restrictive of freedom than reasonably necessary to achieve a substantial therapeutic benefit or to protect the child or adolescent or others from physical injury." Fla. Stat. § 39.407 (5)(a) (2000).

77.     At all times relevant hereto, children in DCF's custody could be placed by DCF in a residential treatment center licensed under s. 394.875 or a hospital licensed under chapter 395 for residential mental health treatment only pursuant to s. 39.407 or they could be placed by the dependency court in accordance with an order of involuntary examination or involuntary placement entered pursuant to s. 394.463 or s. 394.467.   Fla. Stat. § 39.407 (2000).

78.     In the course of the time R.J. was in DCF shelter and foster care, she was in over forty (40) placements.

79.     In the course of the time R.J. was in DCF shelter and foster care, there were at least ten formal abuse reports in which she was the identified victim.

80.     At least half of the abuse reports in which R.J. is identified as the victim were closed with either verification or some indicators that she was abused in the custody of DCF.

81.     All of the Citizens Review Panel reports thus far produced concluded that R.J.'s placements at the time of the review were inappropriate, unsafe, and failed to meet R.J.'s needs.

82.     By ignoring repeated indicators and findings that Plaintiff was being abused while in the custody of DCF, and by ignoring the professional judgment and treatment recommendations of psychiatrists and psychologists who were evaluating and/or treating Plaintiff R.J. from the time of her entry into the care of the department in 1990 until and including June 19, 2000, that R.J. be placed in a therapeutic foster home, Defendants, including

DCF's caseworkers, caseworker supervisors, investigators and placement workers evidenced a deliberate indifference to Plaintiff's fundamental rights of safety and her fundamental right to proper medical care and treatment while in the custody of the department.

83.     This deliberate indifference to Plaintiff's fundamental rights of safety and proper medical care and treatment while in DCF's custody resulted in worsening of Plaintiff R.J.'s emotional condition and her ultimate incarceration in a series of locked facilities in which she was further sexually, physically, and mentally abused.

### Placement Instability

84.     R.J. was born on April 21, 1987.  She lived with her biological parents until March 7, 1990 when she was removed from the home by DCF because of confirmed parental abuse.

85.     In June, 1990, R.J. was found to be a dependent child. Once the courts found R.J. to be a dependent child, it was DCF's statutory responsibility to place R.J. in a stable, nurturing non-emergency shelter placement.

86.     R.J.'s placement record is replete with evidence that DCF did not do so.  Despite the statutory requirement that DCF provide children in its custody with a stable, nurturing placement, DCF moved Plaintiff frequently and usually without notice.

87.     When R.J. was removed from her home on March 7, 1990, she was placed at the Annie Thornton Shelter Home.  She was then almost three (3) years old. R.J. remained at the Thornton Shelter until June 11, 1990.  R.J. was 39 months old when she was moved.

88.     On June 11, 1990, after being adjudicated dependent, R.J. was moved to unspecified placement.

17

89.     R.J. was removed from this unspecified location on July 15, 1990, and no reason was given for the disruption of the placement.

90.     On July 15, 1990, R.J. was moved from the unspecified placement to Johnnie Mae Dudley Foster Home. She was removed from this placement nine days later.  No reason was given for the disruption in placement at the Dudley Foster Home.  R.J. was 40 months old.

91.     On July 26, 1990 R.J. was moved to still another unspecified placement.  She was removed from this placement on August 24, 1990. Again no reason was given for moving R.J. This was the fifth move in three and a half months for this three year old youngster.

92.     On August 24, 1990, R.J. was moved to the Samuel & Irene Burgess Foster Home. She was 3 ½ years old on arrival and remained in the home until June 17, 1993. There was no reason given for the abrupt end to this placement.

93.     On June 17, 1993, R.J. was moved to placement with an unspecified relative.  She was then approximately 6 years old.  She remained in placement with the relative for less than one month.  No reason is given for disruption of placement with the unspecified relative.

94.     On July 15, 1993, R.J. was moved back to the Johnnie Mae Dudley Foster Home, where she had been previously placed.  She was now 6 years and 3 months old.  She remained in this placement for twelve (12) days.

95.     R.J. was then returned to the Burgess Foster Home for a second time.  She remained in the Burgess home for two and a half years.

96.     R.J. was then moved again, this time to the home of her maternal Aunt, Martha Cherry.

97.     R.J. was moved to her Aunt Martha Cherry (relative placement) on February 16,

1996 at nearly 8 years of age. She remained with her aunt for slightly over three months, at which time her uncle decided he did not want the children in his home. This likely had to do with R.J.'s siblings accusing their uncle of sexual abuse. DCF removed R.J. and siblings.

98.     On May 30, 1996, R.J. was moved to the Joel Price Shelter. R.J. was now 8 years 1 month old. R.J., who had been moved ten (10) times in six (6) years, became somewhat disruptive at the Price Shelter, and the Price Shelter asked to have her removed.

99.     Thus, on June 28, 1996 R.J. was moved again, this time to the Catholic Home Shelter.

100.    On November 19, 1996, R.J., who was 8 years 7 months old, was moved still again, this time to an unspecified placement. The reason for the move was not specified.

101.    The very next day, R.J. was moved again, this time to the Emma McGhee Foster Home.

102.    On November 22, 1996, R.J. was returned to the Burgess Foster Home. The reason for the move appears to be that Irene Burgess called and asked for R.J. to be placed back with her.

103.    R.J. remained in the Burgess home until March 10, 1999, when she was abruptly moved to the Catholic Home Shelter. R.J. was now almost twelve years old. No reason was given for the disruption in the Burgess placement.

104.    On April 15, 1999 Catholic Home Shelter moved R.J. to Catholic Home Residential Care.

105.    On July 8, 1999, R.J., who had been moved fifteen (15) times since entering the foster care system, was moved again, this time to Deering Hospital. She was moved because she

made a serious suicide gesture. R.J. was now 12 years 3 months old.

106.    R.J. was at Deering Hospital for one week. On July 15, 1999, she was discharged and placed once again at the Joel Price Shelter.

107.    R.J. did not return to the Catholic Home because Catholic Home refused to allow her to return.

108.    Three weeks later, on August 5, 1999, R.J. was moved to the Ella Black Group Home. This followed urgently upon the Price Shelter demanding R.J. leave because she was striking out at other little girls.

109.    On September 2, 1999, R.J. was moved to Catherine Gray Foster Home. The reason for this move was that R.J. would not take medications which had been prescribed for her.

110.    Five days later, on September 7, 1999, because R.J. refused to go to school after being moved to the Gray Home, R.J. was moved again.

111.    This time R.J. was moved to the Lanzas Therapeutic Foster Home. Even though therapeutic foster homes had long been suggested for this youngster, because it was alleged that the proper paperwork for placement in a therapeutic foster home had not been completed (when in fact it had been completed some months earlier), placement worker, Defendant LATANNE, ordered that R.J. be moved.

112.    On September 16, 1999, R.J. was moved to Miami Bridge. At the Bridge, R.J. was sexually harassed by a thirteen (13) year old male resident, and not surprisingly, R.J. ran away.

113.    After being found and returned to the Bridge, the harassment continued and when staff at the Bridge was unresponsive to R.J.'s complaints, R.J.'s caseworker removed R.J. from

20

the Bridge, sending her instead to the Daniels Foster Home on October 19, 1999. Daniels was Irene Burgess's sister.

114.    On January 4, 2000, R.J. ran away from the Daniels Foster Home. She remained on the streets of Miami until January 13, 2000 when she contacted her caseworker, Bree Bofill Thompson.

115.    R.J. was then placed at Florida Baptist Shelter. She was now 12 years 8 months. There were two reasons R.J. did not return to the Daniels' Home: (1) she was unhappy there, and (2) the Daniels's did not want her back.

116.    On January 17, 2000, R.J. again ran away. This time she was on the streets for nine (9) days.

117.    On January 26, 2000, R.J. was sent to Miami Bridge Central an inpatient psychiatric facility. This move occurred after R.J.'s caseworker Defendant Garces asked the court to send R.J. to a locked program to teach her a lesson. R.J. was not yet thirteen (13) years old.

118.    On February 2, 2000, R.J. managed to run away again. This time she remained on the streets of Miami for two (2) months, during which time she was raped and contracted a sexually transmitted disease.

119.    On April 12, 2000, R.J. was picked up by Probation and taken to the Juvenile Assessment Center and then to Juvenile Detention.

120.    On the same day, the judge in charge of R.J.'s case ordered that R.J. be kept in detention and that she have a 30 day assessment at either Highland Park or JARF. On April 21, 2000 R.J. was removed to Highland Park.

121.    Six days later, on April 27, 2000, R.J. was sent back to DJJ because she assaulted a staff member at Highland Park, and the staff member indicated that she would be filing charges.

122.    On May 17, 2000, R.J. was released from detention and moved to the Mills shelter.

123.    The next day R.J. was sent to live at the Dorothy Marshall Group Home.   One month later, she was again sent to DJJ, this time because, on the basis of repeated domestic violence incidents and poor supervision, the Marshall Home was being closed.

124.    On June 14, 2000, R.J. was moved to an unspecified foster home. She remained there until August 2, 2000, when she was sent to the Juvenile Assessment Center. On August 18, 2000, R.J. was moved to JARF/SART.  She was now 13 years 4 months old.

125.    On January 17, 2001, R.J. was, per court order, sent to Sandy Pines, a locked facility.

126.    On March 9, 2001, R.J. broke a window and eloped from Sandy Pines.  She was found and then Baker Acted to Columbia Hospital.

127.    According to R.J., she remained at Columbia Hospital for one month, despite her records indicating that she was moved to a program one week later.

128.    According to R.J.'s records, on March 16, 2001, she was placed on Citrus Health Network's Crisis Stabilization Unit.  R.J. was not yet fourteen.

129.    Approximately two months later, on May 3, 2001, R.J. was, over her objections, admitted to C.A.T.S.  R.J. remained at C.A.T.S. until August 22, 2002, when she was moved to SAC.  She was 15 years 4 months old.

130.    On November 20, 2002, R.J. was moved to a CHS BHOS Group Home. While at this home, R.J., who should have been (but was not) placed on the adoption list immediately after her parents' parental rights were terminated in June, 1998, began on her own to seek an adoptive family.

131.    In August, 2004, R.J., now 17, moved to Seattle to live with a prospective adoptive family she had located through her own efforts.  In R.J.'s own words, she was so used to rejection and abuse, so used to being disposed of, so unable to form intimate relationships, that she did not know how to ask for or accept love, and she therefore broke every simple rule, with the ultimate result being that the adoption placement failed.

132.    On December 16, 2004, R.J. returned to live in a CHS group home. She remained there until she aged out of the foster care system on her eighteenth birthday.

### Abuse in Placements

133.    Once the courts found R.J. to be a dependent child, it was DCF's responsibility through Defendants to place R.J. not only in a stable, nurturing non-emergency shelter placement, but importantly in a safe placement.  R.J.'s placement record is replete with evidence that DCF did not do so.

134.    In 1990, R.J. and her siblings were, based on a confirmed report of sexual, physical, and mental abuse, removed from the home of their biological parents.

135.    Once the State removes children from the custody of their parents, whether temporarily or permanently, DCF assumes the responsibility for the safety of the child until the child is (1) returned to the biological parent(s), or (2) the child is adopted, or (3) the child ages out of the foster care system.

136.    On September 7, 1994, an Abuse Hotline report was made by R.J.'s biological

mother against Burgess. This report alleged that the children in Burgess's care were dirty and hungry.

137.    Later in September, Defendant AZIA received a copy of a 1994 report of a physical examination of R.J. which indicated that this child, who had previously had, while in DCF custody, normal physical examinations, now had scarring, skin markings and pigmentation inconsistent with those resulting from normal childhood falls.

138.    Defendant AZIA noted that Burgess was being investigated, which should have prompted immediate removal of R.J. and other foster children from the home, but in deliberate disregard of R.J.'s safety and well-being, she was left at the Burgess home to be continuously abused.

139.    On June 20, 1996, a  therapy report by Psychsolutions indicates that R.J. reported that she was hit by her Aunt.  Defendant caseworkers GONZALEZ and CALLWOOD knew about this report because they got a copy of the Psychsolutions report.

140.    Despite this knowledge and despite the obligation to investigate reports of abuse in DCF custody, neither Defendant GONZALEZ nor Defendant CALLWOOD referred the report to either the foster home licensing division or the child protection investigators.

141.    On July 16, 1996, Defendant GONZALEZ conducted an exit interview with R.J. Such interviews were supposed to be, but are not, conducted and documented every time a child in DCF custody was moved from one placement to another.

142.    During that interview, R.J. discussed bizarre punishment.    Defendant GONZALEZ again did not refer the matter to either the foster home licensing division or the child protection investigators in deliberate disregard of Plaintiff's rights.

143.    Defendant GONZALEZ also did not follow up on the report of bizarre

punishment in deliberate disregard of Plaintiff's rights.

144.    On February 28, 1997, a Psychsolutions report indicated that R.J. reported to her therapist that her aunt beat her and her siblings with sticks, and that staff at the Catholic Home beat her.

145.    R.J.'s caseworkers including Defendants GALLOSO, LOPEZ and JOHNSON received copies of this report. Again, Defendant MARTINEZ did not refer the matter to either the foster home licensing division or the child protection investigators.

146.    Defendant MARTINEZ also did not follow up on this report of bizarre punishment.

147.    In 1998, an abuse report was made by an unknown source against Burgess. This report is referred to in the investigator's notes in reference to an abuse report of February 16, 2001.

148.    The 1998 hotline abuse report was said to allege some beatings of foster children at the Burgess foster home.  In 1998 Defendants GALLOSO, LOPEZ, and JOHNSON were the caseworkers.  They received a copy of the abuse report.

149.    There is no note of any abuse reports under investigation in any caseworker note in 1998, nor is there any indication that any of these Defendants complied with DCF's own regulations which mandated removal of foster children from licensed foster homes during the pendency of an investigation of allegations of abuse against the licensee.

150.    In 1999, R.J. made a report of child on child sexual harassment by a 13 year old boy at Miami Bridge.

151.    The report was investigated by the COC team on October 5, 1999.   The investigation was closed with some indicators, which means that there was credible evidence to

support the allegation.

152.    No action was taken at the Bridge to stop the harassment.  On October 18, 1999, following further harassment to which the staff of the Bridge did not respond, caseworker Bree Thompson removed R.J. from the Bridge.

153.    On May 18, 2000, R.J. was placed at the Dorothy Marshall Group Home by DCF placement. At the time that she was sent there, there had been numerous complaints of domestic violence at the home.

154.    Despite this and with deliberate indifference to Plaintiff's rights, the DCF placement unit did not inform the caseworker of the violence, and in addition they placed R.J. into the home where there was known violence.

155.    On June 13, 2000 R.J. had to be moved again because the Marshall Home was being closed due to many domestic violence incidents and poor supervision.

156.    On December 1, 2000, R.J., who was then placed at JARF, made a report of sexually suggestive comments by staff at JARF and also of others sexually touching her.

157.    Although this complaint was investigated by DCF investigator Gianna Barreiro who was supervised by Sonia DeEscobar, and although there were two prior reports regarding this facility, the investigation was superficial, ending with the institution suggesting that children at JARF make complaints against staff to escape from the program.   R.J. remained in this placement.

158.    On January 17, 2001, R.J. made another report of child on child inappropriate sexual touching by another female at JARF.

159.    Consistent with a pattern of response, the COC finds some indicators of abuse, i.e. credible evidence existed to support the allegations.  No notation of this report is found in the

caseworker notes.

160.    On January 26, 2001, R.J. made a report of child on child sex abuse by another female at Sandy Pines to which she had been transferred.

161.    Again the child-on-child team found some indicators, but nothing was done by the staff at Sandy Pines to protect R.J. and no note of this event is found in the caseworker notes.

162.    On February 16, 2001, R.J. made an abuse report regarding staff at Sandy Pines. Leslie Jones investigator and Helen Kloock supervisor were assigned the case. The complaint is one alleging generally bad treatment by staff and child on child sex abuse.

163.    Defendant GONZALEZ, whose job it is to encourage, not discourage, thorough investigation of such complaints, told Investigator Jones that R.J. "does this to bring attention to herself" and "to get her way."

164.    The complaints of physical injury, sexual molestation and mental injury were thereupon closed with no indicators.  It was during this episode that the 1994 and 1998 reports regarding Burgess came to light.

165.    On February 20, 2001, the Judge assigned to R.J.'s case ordered family therapy with former foster mother Burgess. Shortly thereafter, R.J. eloped from Sandy Pines, was Baker Acted to Columbia Hospital, and was thereafter placed on the Citrus Health Network Crisis Stabilization Unit.

166.    On April 29, 2001, R.J. made an abuse report regarding physical abuse by staff at CATS Crisis Stabilization Unit.  This was investigated by Elisa Pelaez who rapidly closed case with no indicators.  In Ms. Pelaez's report she comments that R.J. has made eight prior reports of abuse.

167.    Following closure of the case with no indicators, the Public Defender reported to

the Court on May 2, 2001, that CATS CCSU staff was abusing R.J., specifically by requiring her to sleep on the floor with no mattress.

168.    R.J.'s DCF caseworker's notes show an attempt to move R.J. to CATS from CATS CCSU before Rene Gordon (PD) could make the report.

169.    On September 22, 2001, there was another report regarding abuse to R.J. at CATS. This was investigated by Defendant, WINNIFIEFRED RAMSEY who was supervised by Holly Spears.

170.    Bruises, welts and mental injury are confirmed. R.J. will not reveal the name of staff member who beat her with a belt, claiming that when the staff member hit her with his belt, he was only playing. Despite this confirmed physical abuse, R.J. was left at CATS.

171.    On December 21, 2001, there was a report of past abuse to R.J. by Burgess (report while at CATS but refers to past). The report of the abuse came out in therapy and in a poem.

172.    The report was investigated by Lorna Fletcher who was supervised by Vanessa Miller. The narrative report indicates that there were 34 harsh punishments.

173.    R.J. reported to the investigator that sibling D.J. could confirm the abuse but that he was still at the Burgess home. Interviewed, D.J. confirmed the abuse, specifically beatings and mental injury. The case was closed as some indicators.

174.    Rather than removing R.J.'s siblings from the home, the children remained and Burgess was reminded of disciplinary guidelines.

175.    On March 2, 2002, R.J. made her first report in which she alleged sexual battery by Vykie Young, a staff member at CATS. The abuse call was investigated by Defendant WINNIEFRED RAMSEY Ramsey who also investigated the September 2001 abuse call.

176.    The case was turned over to the police. Young was suspended pending the

outcome of the investigation. Because R.J. was not immediately removed from CATS during the pendency of the investigation, thus allowing for other staff to threaten her, R.J. recanted. The investigators found, on the basis of the recantation, no indicators of abuse.

177.    On October 29, 2002 R.J. called in report # 2 regarding Vykie Young. R.J. was now at a placement, SAC. This report repeated the allegations of March 2, 2002 and added more allegations regarding behavior by Vykie Young after he came back to work at conclusion of prior investigation.

178.    This abuse call was investigated by Martha Davis Taylor, supervised by Jennifer Priestly. Now safely out of CATS, R.J. told the investigator that the reason she recanted during the first investigation was that other staff were threatening her.

179.    The investigators close the case as no indicators based on the large number of previous complaints, "history of making false complaints" (not true) and fact that she was no longer at CATS.

### Failure to place R.J. in a therapeutic foster home leads to confinement

180.    Through the time R.J. was in the custody of DCF, there were multiple recommendations by qualified professionals as well as the Citizens Review Panel, that R.J. should be placed in a therapeutic foster home as a result of her deteriorating mental health condition, increasing diagnoses and harm that she was experiencing in care.

181.    Failure to place R.J. in a therapeutic foster home led to confinement on locked units.

182.    On June 7, 1996, a staffing suggested that R.J., who by this time had been removed from the Burgess home for a second time, and had also been removed from placement at her aunt's home, should be placed in a therapeutic foster home. The staffing recommendation

was ignored.

183.   On June 24, 1996, R.J., who was then at the Price Shelter, was evaluated by psychiatrist Dr. Bregman.  He recommended placement in a therapeutic foster home.

184.   R.J.'s caseworker Defendant, GONZALEZ received a copy of this recommendation.  The recommendation was ignored.

185.   On June 28, 1996 (the date on which R.J. was moved to Catholic Home), a CHI/FSPT staffing suggested that R.J. should be placed in a therapeutic foster home.

186.   Despite this recommendation, on October 7, 1996, Defendant CALLWOOD unilaterally decided to place R.J. in a regular foster home rather than a therapeutic foster home in deliberate disregard of her right to be free from harm.

187.   On July 1, 1999, caseworker Bree Thomspon reviewed R.J.'s file and recommended that R.J., who was then at Catholic Home, should be placed in a therapeutic foster home.

188.   On July 14, 1999, the psychiatrist treating R.J. at Deering Hospital (where she was then placed) recommended that R.J. be placed in a therapeutic foster home.

189.   Despite the efforts of R.J.'s then caseworker, Bree Thompson, unknown DCF placement employees ignored the recommendation.

190.   On July 15, 1999, caseworker Thompson again requested that R.J. be placed in a therapeutic foster home.  This is the very same day that R.J. was moved to the Joel Price shelter.

191.   Again, DCF placement ignored the recommendation of professionals evaluating and treating R.J. and also ignored the request of R.J.'s caseworker as R.J. was deteriorating.

192.   On September 7, 1999, R.J. was placed in the Lanzas Therapeutic Foster Home only to be removed, less than one day later, by placement worker, Defendant LATANNE, who

asserted that the correct paperwork has not been completed.

193.    In fact on June 28, 1996, a CHI/FSPT staffing suggested that R.J. should be placed in a therapeutic foster home.

194.    On December 6, 1999, the Citizens Review Panel found R.J.'s placement was not appropriate in that it did not meet her emotional needs, and further found that R.J.'s placement was not safe.

195.    The panel was particularly concerned with R.J.'s serious behavior problems, her history of an excessive number of placements, the fact that R.J. was no longer on medication, that therapeutic and other services were repeatedly disrupted with repeated changes in placement, and that the foster parent did not get R.J.'s Zoloft refilled because there was an improvement in behavior.  The Citizen review panel report findings were known to DCF.

196.    On May 3, 2000, the Citizens review panel found R.J.'s placement was not appropriate (does not meet emotional needs) and was not safe.  They opined that if R.J., who was then in DJJ detention, was released from detention and placed in a regular foster home, that she would run away.  The panel noted that while R.J. was at Highland Park for six days in April, that she had assaulted a teacher. These findings were known to DCF.

197.    April 21, 2000, JARF recommended long term residential treatment for R.J. On May 4, 2000, another staffing recommended referral for a therapeutic foster home.  At this point, R.J. is in DJJ detention.

198.    On May 8, 2000, psychiatrist Miller at the University of Miami recommended R.J. be placed in a therapeutic foster home.

199.    On June 19, 2000 psychologist Rice, in a treatment summary, recommended a therapeutic foster home. R.J. was, over these recommendations, sent to an unspecified regular

31

foster home.

200.    October 31, 2000, the Citizens review panel still again found that R.J.'s placement was not appropriate (does not meet emotional needs) and was not safe.

201.    On December 27, 2000, psychiatrist Dr. Cremer from SART recommended that R.J. be placed on a locked unit.

202.    On January 5, 2001, psychologist Dr. Ditson recommended a locked unit.

203.    In March 2001, R.J. had a psychosexual evaluation. The March 16, 2001 addendum to psychosexual report by LMHC Bergeman recommended  R.J. be placed on a locked unit.

204.    On March 20, 2001, the Citizens review panel again concluded that R.J.'s placement was not appropriate (does not meet emotional needs) and was not safe.

205.    They noted that R.J. was then in a Baker Act facility and that Residential treatment facilities and therapeutic adoptive homes were not available.  They noted that DCF had yet to find an appropriate facility for R.J., and they noted in particular that R.J. had been in several locked facilities and had completed none of those programs.

206.    On October 2, 2001, psychologist Ana Rivas Vasquez recommended placement in a Level 8 DJJ program or another Level I locked facility.

207.    On October 5, 2001, the Citizens review panel again found R.J.'s placement was not appropriate (does not meet emotional needs) and was not safe.

208.    On October 25, 2001 the CRC recommended R.J. remain in a Level I program.

209.    On December 21, 2001, Lorna Fletcher, a child protection investigator, after investigating an abuse hotline report, recommended that R.J. be sent to a therapeutic foster home.

210.    January 17, 2002, R.J. was staffed for Level II specialized therapeutic foster care

32

by ADM.

211.    On June 11, 2002, the Children's mental health team staffed R.J..   They recommended step down to a therapeutic foster home.

212.    On June 19, 2002 psychologists Rice and Ana Rivas-Vasquez recommended that R.J. be placed in a therapeutic foster home

213.    All of the aforementioned reports and recommendations were known to R.J.'s various DCF caseworkers who are named as Defendants herein.

214.    With the exception of the one night stay at the Lanzas Therapeutic Foster Home, R.J. was never sent to a therapeutic foster home.  Instead she was placed in a series of restrictive locked facilities including among them DJJ, JARF, Highland Park, Sandy Pines, Columbia Hospital, and C.A.T.S.

## R.J.'s Mental Health Deteriorates

215.    As a result of Defendant's failures to protect R.J. from continuous abuse in care and failure to place her in a stable, safe, and therapeutic foster home, R.J. rapidly deteriorates while in care.

216.    R.J. entered foster care at the age of two with no mental health problems.  Her traumatic experience in the foster care system has caused her to suffer from severe mental health disorders including major depression, intermittent explosive disorder, conduct disorder, borderline personality disorder, mood disorder, dysthymic disorder, anhedonia (the inability to experience pleasure from normally pleasurable life events such as eating and social interaction), schizoaffective disorder, post traumatic stress disorder, polysubstance abuse, emotional instability, and suicidal ideation.

217.    In 1995, at the age of seven (7) years old, R.J. was diagnosed with cyclothymic

disorder (bipolar disorder) due to her traumatic experience of abuse and neglect and life in foster care. It was recommended that she be placed in a permanent home that is supportive, caring, and provides stability and safety, but that did not happen.

218.   R.J. did not see herself as valuable or lovable, and she was diagnosed with adjustment disorder in 1996. A psychological evaluation indicated that she had been severely traumatized and was beginning to exhibit signs of post traumatic stress disorder and borderline personality disorder, and had been evidencing some self-mutilating behaviors.

219.   R.J. was deemed to be more fragile than her siblings and the psychologist noted that her diagnosis could lead to a lifelong personality disturbance that could be stopped at that time while she had enough plasticity to heal with some efficiency and effectiveness. The keys to healing for R.J. would be a stable, permanent, loving, and supportive home, and long term therapy. A therapeutic foster home with only her and one sibling was recommended, along with psychotherapy. However, R.J. remained in a regular foster home with at least four other children, for another three years.

220.   By 1998, R.J.'s mental health continued to deteriorate due to inappropriate placements, and she was diagnosed with post traumatic stress disorder and oppositional defiance disorder.

221.   In June 1999, R.J.'s therapist again recommended that she be placed in a therapeutic foster home with no other children. Her condition continued to worsen and one month later she was Baker Acted, spending a week in the hospital mental health unit.

222.   By September 1999, she had been diagnosed with major depressive disorder and was on psychotropic medication.

223.   By the age of fourteen, R.J. was using alcohol and cannabis as a coping

mechanism. She was in numerous residential treatment facilities for mental health and substance abuse issues and had been hospitalized at least three times for suicidal ideation or attempts. She had no love or support and she continued her downward spiral, eventually developing a juvenile justice history leading to several commitments.

224.    Despite repeated recommendations from professionals that R.J. be placed in a therapeutic foster home early on, she spent the remainder of her minor years in and out of juvenile justice custody, group homes, and residential treatment facilities, with one failed out of state adoption attempt, until she finally aged out of the system.

225.    Not only were there multiple psychological and psychiatric evaluations indicating that R.J.'s placements were inappropriate and her mental health was deteriorating, but R.J.'s foster parents, therapist, and the DCF case manager and investigator all expressed concern that she was not in the proper placement and needed a much more structured environment.

226.    In June 1997, an attorney wrote a letter to DCF which was known to the DCF Defendants herein on behalf of Irene Burgess, R.J.'s then foster parent. She indicated that R.J. had special needs, and she did not know how Mrs. Burgess could handle all five children placed in her care. She said that the children need more effort and attention and require a great deal of care.

227.    That same month, Mrs. Burgess wrote a letter to DCF expressing frustration that R.J. continued to be placed with her despite her need for a therapeutic home. She stated that DCF first told her that R.J. was in need of a therapeutic setting seven (7) years prior when she was initially placed with her. She was told that placement with her would only be temporary, but R.J. remained in her home off and on for a total of nine (9) years. She reported that R.J. needed twenty-four (24) hour supervision and could not be left alone or unattended.

228.     Despite these clear warnings, Defendants left R.J. in this home for another two years.

229.     When placement ultimately broke down in the foster home in 1999, the Department still failed to place R.J. in an appropriate home. She was permanently discharged from the Catholic Home for Children ("CHC") group home program because, according to them, her need for attention was so great that the program was not then and never would be able to meet all of her needs.

230.     The CHC therapist wrote a letter to DCF stating that R.J. would thrive in a therapeutic home where she could be given the individual attention she needed on a constant basis, and that placement in an appropriate home should be done as soon as possible for R.J.'s well being. She expressed great concern that if R.J. did not receive the attention she needed at that point, she may begin to seek inappropriate attention from males.

231.     It was then that DCF finally began to look for a therapeutic home for R.J., but this required approval by the Case Review Committee. R.J.'s case worker, Bree Thompson, found a placement that was willing to take her until a therapeutic home was approved; however the DCF placement unit ignored her multiple requests and instead placed R.J. in a therapeutic home without getting approval.

232.     R.J. was finally in a specialized placement where she felt she belonged, and after less than twenty-four (24) hours, DCF removed her because its employees failed to follow proper protocol. DCF reported that specialized placement may not be appropriate, despite numerous reports indicating that it was.

233.     R.J.'s caseworker, Ms. Thompson wrote a letter to the DCF placement unit supervisor, Defendant LATANNE, expressing her outrage at the handling of the case. She

documented that she "*was at a loss for words*" since she informed the placement unit of an available home that would have avoided this unnecessary placement and removal. She expressed great concern that the removal would "*devastate*" R.J. and cause her to regress even further, especially since she would have to change schools again and necessary therapy would be interrupted.

234.    Ms. Thompson informed Defendant LATANNE that they "should at least be working together for the best interest of R.J." Ms. Thompson was distressed that services, including individual therapy, were disrupted when R.J. changed placements over and over again. Despite actual notice to superiors that DCF was continuously failing to provide her with the services and placement she needed, R.J. continued to be placed in various shelters, foster homes, group homes, and residential facilities.

235.    After her removal due to DCF's negligence, R.J. was never placed back in a therapeutic home. In June 2000, R.J. had been moved yet again from another placement that was being investigated for domestic violence and inadequate supervision. She was in a DCF shelter when her case manager wrote a status report to the court once again stating that R.J. needed to be placed in a more structured facility where her needs could be better served.

236.    R.J. was shuffled from one residential treatment facility to another and abuse reports were investigated by DCF. DCF investigators reported that R.J. risk was low, despite numerous allegations of physical abuse, sexual abuse, and neglect in these facilities, often with verified findings.

237.    In 2001, one investigator documented that R.J. "*apparently has many issues. She is the product of the system she has been in.*" Once again, even the child protective investigator recommended a therapeutic setting at a minimum. Several investigators documented that R.J.

initiated physical confrontation and came on to male staff sexually, exactly what R.J.'s therapist warned the Department would happen several years earlier if she wasn't placed in an appropriate setting. Notwithstanding such knowledge, Defendant GARCES took no action.

## COUNT I – 42. U.S.C. §1983 – DEFENDANT AZIA

238.    Plaintiff hereby reavers and realleges paragraphs 1 through 5, 8 through 11, and 49 through 237 as if fully set forth herein.

239.    At all times relevant hereto, Defendant AZIA, R.J.'s DCF caseworker in 1994, was aware of the results of both the 1990 physical examination of R.J., which revealed no areas of hyper-pigmentation inconsistent with normal childhood falls and the 1994 physical examination of R.J., which revealed clear evidence scarring and of physical abuse.  These reports were contained in the case file maintained by Defendant AZIA and were otherwise available to her.

240.    At times relevant hereto, Defendant AZIA, as R.J.'s caseworker, was aware of the Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry.  Defendant AZIA was aware of this report because DCF procedures required that the Abuse Hotline notify the casework of a child in DCF custody when such a report was filed.

241.    At times relevant hereto, Defendant AZIA was aware that Plaintiff and the other children at the Burgess foster home were at substantial risk of serious harm at the foster home.

242.    At times relevant hereto, Defendant AZIA was deliberately indifferent to the safety and welfare of the Plaintiff by not complying with DCF procedures which mandated removal of children in DCF custody from a foster home during the pendency of an abuse investigation and by allowing Plaintiff, R.J. to remain in the Burgess foster home.

38

243.    Specifically, by September, 1994 Defendant AZIA was aware that Plaintiff, R.J., and all the other children in the Burgess foster home were at substantial risk of harm from both physical abuse and neglect by Mrs. Burgess.

244.    Defendant AZIA violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in an unsafe home that subjected Plaintiff R.J. to a heightened risk of danger and caused her to be repeatedly abused.

245.    Defendant AZIA acted in total disregard of the constitutional rights of the Plaintiff.

246.    Defendant AZIA's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

247.    As a result of Defendant AZIA's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages.  Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

248.    Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant AZIA for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT II – 42. U.S.C. §1983 – DEFENDANT ROBERTS

249.    Plaintiff hereby reavers and realleges 1 through 5, 12 through 15, and 49 through 237 paragraphs as if fully set forth herein.

250.    At times relevant hereto, Defendant  ROBERTS, R.J.'s DCF caseworker from October 19, 1995 through March 18, 1996 was aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, yet he did not privately interview R.J. or her siblings, who were placed in the Burgess foster home, to determine whether they were still being deprived of food.

251.    At times relevant hereto Defendant ROBERTS knew the contents of R.J.'s casework file, which he was required by DCF procedures to read and maintain, including the content of the 1990 and 1994 physical examination reports.

252.    At times relevant hereto, Defendant ROBERTS was aware that Plaintiff and the other children at the Burgess foster home were at substantial risk of serious harm at the home as described above.

253.    At times relevant hereto, Defendant ROBERTS was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home.

254.    Specifically, because he read the September 7, 1994 note by Defendant AZIA, Defendant ROBERTS was aware that Plaintiff, R.J., and all the other children in the Burgess foster home were at substantial risk of harm of neglect and physical abuse by Mrs. Burgess.

255.    Defendant ROBERTS violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in an unsafe home that subjected Plaintiff R.J. to a substantial risk of serious harm and caused her to be repeatedly abused.

256.    Defendant ROBERTS acted in total disregard of the constitutional rights of the

40

Plaintiff.

257. Defendant ROBERTS' actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights. At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

258. As a result of Defendant ROBERTS' deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages. Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

259. Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant ROBERTS for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

### COUNT III – 42. U.S.C. §1983 – DEFENDANTS GONZALEZ

260. Plaintiff hereby re-avers and re-alleges paragraphs 1 through 5, 16 through 19, and 49 through 237 as if fully set forth herein.

261. Because Defendant GONZALEZ, Plaintiff R.J.'s DCF caseworker from March 18, 1996 through October 7, 1996, was obligated to know the content of R.J.'s casework file and to maintain same, at times relevant hereto, Defendant GONZALEZ, was aware of the possession of marijuana conviction of Mr. Cherry (as reported to DCF in 1990), the 1994 Abuse

Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, and the reports of the 1990 and 1994 physical examinations.

262.   At all times relevant hereto, Defendant GONZALEZ, who received copies of the reports of Psychsolutions, knew about both the June 20, 1996 Psychsolutions report that R.J. (a) was being hit in the Cherry house and (b) was falsely told that Plaintiff and her sister had killed their mother, and the July 11, 1996 exit interview conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house.

263.   At times relevant, Defendant GONZALEZ was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home.

264.   At times relevant hereto, Defendant GONZALEZ was aware that Plaintiff and the other children at the Burgess foster home were at substantial risk of serious harm at the home.

265.   At times relevant hereto, Defendant GONZALEZ was aware that Plaintiff and her siblings were at unreasonable risk of physical and mental harm by continued contact with the members of the Cherry house.

266.   At times relevant hereto, Defendant GONZALEZ was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home and by permitting continued contact with the Cherry family.

267.   Specifically, by July, 1996 Defendant GONZALEZ was aware that Plaintiff, R.J., and all the other children in the Burgess foster home were at substantial risk of serious harm of neglect and physical abuse by Mrs. Burgess, and that Plaintiff was at substantial risk of harm

42

through continued contact with the Cherry family.

268.    At times relevant hereto, Defendant GONZALEZ was deliberately indifferent to the safety and welfare of Plaintiff by not asking DCF foster care placement and the other necessary subdivisions of the foster care placement system to place Plaintiff R.J., consistent with the recommendations made by R.J.'s evaluating and treating professionals, in a therapeutic foster home.

269.    Defendant GONZALEZ violated Plaintiff R.J.'s fundamental right of physical safety by allowing her to have continued contact with the Burgess family and by allowing her to have continued contact with the Cherry family thus subjecting Plaintiff R.J. to a heightened risk of danger and causing her to be repeatedly abused. Defendant GONZALEZ further violated Plaintiff R.J.'s fundamental rights by not working to assure Plaintiff's placement in a therapeutic foster home.

270.    Defendant GONZALEZ acted in total disregard of the constitutional rights of the Plaintiff.

271.    Defendant GONZALEZ actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

272.    As a result of Defendant GONZALEZ's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages.  Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

273.    Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant GONZALEZ for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT IV – 42. U.S.C. §1983 – DEFENDANT CALLWOOD

274.    Plaintiff hereby reavers and realleges paragraphs 1 through 5, 20 through 23, and 49 through 237 as if fully set forth herein.

275.    At times relevant hereto, Defendant  CALLWOOD, Plaintiff's DCF caseworker from October 7, 1996 through December 2, 1996, was  aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the reports of the physical examinations of R.J. conducted in 1990 and 1994, the June 20, 1996 Psychsolutions report that R.J. was being hit in the Cherry house, and the July, 1996 exit interview conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house.

276.    Defendant  GONZALEZ  was  also  aware  of  the  June  7,  1996  staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home.

277.    At times relevant hereto, Defendant CALLWOOD was aware that Plaintiff and the other children at the Burgess foster home were at unreasonable risk of harm at the home.

278.    At times relevant hereto, Defendant CALLWOOD was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home.

279.    Specifically, by October, 1996 Defendant CALLWOOD was aware that Plaintiff, R.J. would be at substantial risk of serious harm if again placed in the Burgess foster home, and she was aware that all the other children in the Burgess foster home were at substantial risk of harm of neglect and physical abuse by Mrs. Burgess.  Defendant CALLWOOD was also aware that Plaintiff's mental health was continuing to deteriorate and that the professionals evaluating and treating Plaintiff had recommended placement in a therapeutic foster home and that in fact FSPT had recommended such placement.

280.    Defendant CALLWOOD violated Plaintiff R.J.'s fundamental right of physical safety by ignoring the placement recommendations of the professionals evaluating and treating Plaintiff, by specifically making a decision to place Plaintiff in a regular foster home rather than a therapeutic foster home, and by again placing her in an unsafe home that subjected Plaintiff R.J. to a heightened risk of danger and caused her to be repeatedly abused.

281.    Defendant CALLWOOD acted in total disregard of the constitutional rights of the Plaintiff.

282.    Defendant CALLWOOD's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

283.    As a result of Defendant CALLWOOD's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable

compensatory damages.  Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

284.    Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant CALLWOOD for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT V – 42. U.S.C. §1983 – DEFENDANT CHIN

285.    Plaintiff hereby reavers and realleges paragraphs 1 through 5, 24 through 27, and 49 through 237 as if fully set forth herein.

286.    At times relevant hereto, Defendant CHIN, Plaintiff's DCF caseworker from December 2, 1996 through February 17, 1997,  was  aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the reports of the 1990 and 1994 physical examinations of R.J., the June 20, 1996 Psychsolutions report that R.J. was being hit in the Cherry house, and the July, 1996 exit interview conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house.

287.    Defendant CHIN was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home.

46

288.    At times relevant hereto, Defendant CHIN was aware that Plaintiff and the other children at the Burgess foster home were at unreasonable risk of harm at the home.

289.    At times relevant hereto, Defendant CHIN was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home rather than being placed in a therapeutic foster.

290.    Specifically, by December, 1996 Defendant CHIN was aware that Plaintiff, R.J. would be at substantial risk of serious harm if she remained in the Burgess foster home, and she was aware that all the other children in the Burgess foster home were at substantial risk of serious harm of neglect and physical abuse by Mrs. Burgess.

291.    Moreover, Defendant CHIN was aware of the deteriorating condition of Plaintiff's mental health but despite this knowledge she ignored the recommendations of the professionals evaluating and treating Plaintiff.

292.    Defendant CHIN violated Plaintiff R.J.'s fundamental right of physical safety by again placing her in a home which she knew was unsafe and subjected Plaintiff R.J. to a substantial risk of serious harm and caused her to be repeatedly abused.

293.    Defendant CHIN violated Plaintiff's fundamental right of physical safety by allowing her mental health to significantly deteriorate without following the recommendations of the professionals providing evaluation and treatment to the Plaintiff.

294.    Defendant CHIN acted in total disregard of the constitutional rights of the Plaintiff.

295.    Defendant CHIN's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and

free from unreasonable risk of harm

296.  As a result of Defendant CHIN's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages. Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

297.  Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant CHIN for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT VI – 42. U.S.C. §1983 – DEFENDANT GALLOSO

298.  Plaintiff hereby reavers and realleges 1 through 5, 28 through 30, and 49 through 237 as if fully set forth herein.

299.  At times relevant hereto, Defendant GALLOSO, Plaintiff's DCF counselor from February 17, 1997 through May 9, 1997, was aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the reports of the 1990 and 1994 physical examinations of R.J., the June 20, 1996 Psychsolutions report that R.J. was being hit in the Cherry house, the July, 1996 exit interview conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house, and the February 28, 1997 Psychsolutions report that R.J.'s aunt beat her with sticks when she misbehaved and that staff at the Catholic Home hit her.

48

300.   Defendant GALLOSO was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home.

301.   At times relevant hereto, Defendant GALLOSO was aware that Plaintiff and the other children at the Burgess foster home were at a substantial risk of serious harm at the home.

302.   At times relevant hereto, Defendant GALLOSO was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home.

303.   Specifically, by February 28, 1997 Defendant GALLOSO was aware that Plaintiff, R.J., and all the other children in the Burgess foster home were at substantial risk of serious harm of neglect and physical abuse by Mrs. Burgess.

304.   Moreover, Defendant GALLOSO was aware of the deteriorating condition of Plaintiff's mental health but despite this knowledge he ignored the recommendations of the professionals evaluating and treating Plaintiff.

305.   Defendant GALLOSO violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in an unsafe home that subjected Plaintiff R.J. to a substantial risk of serious harm and caused her to be repeatedly abused.

306.   Defendant GALLOSO violated Plaintiff's fundamental right of physical safety by allowing her mental health to deteriorate without following the recommendations of the professionals providing evaluation and treatment to the Plaintiff.

307.   Defendant GALLOSO acted in total disregard of the constitutional rights of the Plaintiff.

308. Defendant GALLOSO's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights. At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

309. As a result of Defendant GALLOSO's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages. Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

310. Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant GALLOSO for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT VII – 42. U.S.C. §1983 – DEFENDANT LOPEZ

311. Plaintiff hereby reavers and realleges paragraphs 1 through 5, 31 through 34, and 49 through 237 as if fully set forth herein.

312. At times relevant hereto, Defendant LOPEZ, Plaintiff's DCF caseworker from May 9, 1997 through October 16, 1997, was aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the reports of the 1990 and 1994 physical examinations of R.J., the June 20, 1996 Psychsolutions report that R.J. was being hit in the Cherry house, the July, 1996 exit interview

conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house, and the February 28, 1997 Psychsolutions report that R.J.'s aunt beat her with sticks when she misbehaved and that staff at the Catholic Home hit her.

313.    Defendant LOPEZ was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home

314.    At times relevant hereto, Defendant LOPEZ was aware that Plaintiff and the other children at the Burgess foster home were at substantial risk of serious harm at the home.

315.    At times relevant hereto, Defendant LOPEZ was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home.

316.    Specifically, by February 28, 1997 Defendant LOPEZ was aware that Plaintiff, R.J., and all the other children in the Burgess foster home were at substantial risk of serious harm of neglect and physical abuse by Mrs. Burgess.

317.    Defendant LOPEZ violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in an unsafe home that subjected Plaintiff R.J. to a substantial risk of danger and caused her to be repeatedly abused.

318.    Defendant LOPEZ violated Plaintiff's fundamental right of physical safety by allowing her mental health to deteriorate without following the recommendations of the professionals providing evaluation and treatment to the Plaintiff.

319.    Defendant LOPEZ acted in total disregard of the constitutional rights of the Plaintiff.

320.    Defendant LOPEZ's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

321.    As a result of Defendant LOPEZ's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages.  Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

322.    Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant LOPEZ for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT VIII – 42. U.S.C. §1983 – DEFENDANT JOHNSON

323.    Plaintiff hereby reavers and realleges paragraphs 1 through 5, 35 through 38, and 49 through 237 as if fully set forth herein.

324.    At times relevant hereto, Defendant   JOHNSON, Plaintiff's DCF caseworker from October 16, 1997 through at least June 3, 1999 was  aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the reports of the 1990 and 1994 physical examinations of R.J., the June 20, 1996 Psychsolutions report that R.J. was being hit in the Cherry house, the July, 1996 exit

52

interview conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house, the February 28, 1997 Psychsolutions report that R.J.'s aunt beat her with sticks when she misbehaved and that staff at the Catholic Home hit her and the 1998 Abuse report that children in the Burgess foster home were being hit and injured.

325. Defendant JOHNSON was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home

326. At times relevant hereto, Defendant JOHNSON was aware that Plaintiff and the other children at the Burgess foster home were at substantial risk of serious harm at the home.

327. At times relevant hereto, Defendant JOHNSON was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain in the Burgess foster home.

328. Specifically, by October 30, 1997 Defendant JOHNSON was aware that Plaintiff, R.J., and all the other children in the Burgess foster home were at substantial risk of harm of neglect and physical abuse by Mrs. Burgess.

329. Defendant JOHNSON violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in an unsafe home that subjected Plaintiff R.J. to a substantial risk of danger and caused her to be repeatedly abused.

330. Defendant JOHNSON violated Plaintiff's fundamental right of physical safety by allowing her mental health to deteriorate without following the recommendations of the professionals providing evaluation and treatment to the Plaintiff.

331. Defendant JOHNSON acted in total disregard of the constitutional rights of the

Plaintiff.

332.   Defendant JOHNSON's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.   At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

333.   As a result of Defendant JOHNSON's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages.   Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

334.   Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant JOHNSON for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT VIII – 42. U.S.C. §1983 – DEFENDANT GARCES

335.   Plaintiff hereby reavers and realleges paragraphs 1 through 5, 39 through 42, and 49 through 237 as if fully set forth herein.

336.   At times relevant hereto, Defendant  GARCES, Plaintiff's DCF caseworker from May 8, 2000 through March 15, 2001, was  aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the reports of the 1990 and 1994 physical examinations of R.J., the June 20, 1996

Psychsolutions report that R.J. was being hit in the Cherry house, the July, 1996 exit interview conducted by Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house, the February 28, 1997 Psychsolutions report that R.J.'s aunt beat her with sticks when she misbehaved and that staff at the Catholic Home hit her and the 1998 Abuse report that children in the Burgess foster home were being hit and injured.

337.    Defendant GARCES was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home. Defendant GARCES was also aware of caseworker Bree Thompson's July 1, 1999 recommendation that Plaintiff be placed in a therapeutic foster home, of the July 14, 1999 recommendation of the psychiatrist treating Plaintiff at Deering Hospital that Plaintiff be placed in a therapeutic foster home, the July 15, 1999 request by caseworker Thompson that Plaintiff be placed in a therapeutic foster home and the September 7, 1999 placement of Plaintiff in a therapeutic foster home with its termination by placement for the alleged failure to have the correct paperwork on file.

338.    Defendant GARCES was further aware of the May 4, 2000 staffing which recommended that Plaintiff be placed in a therapeutic foster home, the May 8, 2000 recommendation of University of Miami psychiatrist Miller that Plaintiff be placed in a therapeutic foster home, and the June 19, 2000 recommendation by psychologist Rice that Plaintiff be placed in a therapeutic foster home.

339.    Despite this knowledge, Defendant GARCES allowed Plaintiff to be placed at the Marshall Group Home, which at the time of Plaintiff's placement, was being investigated

because of allegations of domestic violence and poor supervision.

340.    At times relevant hereto, Defendant GARCES was aware that Plaintiff's mental health was continuing to deteriorate, that she was now in legal trouble, that she had repeatedly run away, that she had been raped, and that while on the streets she had contracted a number of sexually transmitted diseases and that Plaintiff was at substantial risk of serious harm unless placed in a therapeutic foster home.

341.    As a direct result of the failure to place Plaintiff in a therapeutic foster home, Plaintiff began a long and painful series of placements in locked mental health facilities in which she was further physically, sexually and mentally abused.

342.    At times relevant hereto, Defendant GARCES was deliberately indifferent to the safety and welfare of the Plaintiff by not seeking more appropriate placement for Plaintiff.

343.    Specifically, Defendant GARCES was aware that Plaintiff, R.J., was at substantial risk of serious harm as a result of neglect and physical abuse the various locked facilities into which she was placed.

344.    Defendant GARCES violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in unsafe placement that subjected Plaintiff R.J. to a heightened risk of danger and caused her to be repeatedly abused.

345.    Defendant GARCES violated Plaintiff's fundamental right of physical safety by allowing her mental health to deteriorate without following the recommendations of the professionals providing evaluation and treatment to the Plaintiff and by making no effort to place her in a less restrictive environment.

346.    Defendant GARCES acted in total disregard of the constitutional rights of the Plaintiff.

347.    Defendant GARCES's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

348.    As a result of Defendant GARCES's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages.  Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

349.    Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant GARCES for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

### COUNT IX – 42. U.S.C. §1983 – DEFENDANT LATTANE

350.    Plaintiff hereby reavers and realleges paragraphs 1 through 5, 43 through 45, and 49 through 237 as if fully set forth herein.

351.    At times relevant hereto, Defendant LATTANE was the Supervisor of the placement unit serving R.J.  As supervisor of the placement unit, Defendant LATTANE was aware of the 1994 Abuse Hotline complaint filed by R.J.'s biological mother accusing Irene Burgess of abuse, to wit the children were dirty and hungry, the June 20, 1996 Psychsolutions report that R.J. was being hit in the Cherry house, the July, 1996 exit interview conducted by

Defendant GONZALEZ during which R.J. reported bizarre punishment at the Burgess house, the February 28, 1997 Psychsolutions report that R.J.'s aunt beat her with sticks when she misbehaved and that staff at the Catholic Home hit her and the 1998 Abuse report that children in the Burgess foster home were being hit and injured.

352.   Defendant LATTANE was also aware of the June 7, 1996 staffing recommendation that R.J. should be placed in a therapeutic foster home, the June 24, 1996 psychiatric report of Dr. Bregman which recommended that R.J. should be placed in a therapeutic foster home, and the report of the CHI/FSPT staffing of June 28, 1996 recommending R.J.'s placement in a therapeutic foster home.

353.   Defendant LATTANE was also aware of caseworker Bree Thompson's July 1, 1999 recommendation that Plaintiff be placed in a therapeutic foster home, of the July 14, 1999 recommendation of the psychiatrist treating Plaintiff at Deering Hospital that Plaintiff be placed in a therapeutic foster home, and the July 15, 1999 request by caseworker Thompson that Plaintiff be placed in a therapeutic foster home.

354.   Despite this knowledge, and the knowledge that placement in a therapeutic foster home required approval of both the FSTP and the CRC, Defendant LATTANE allowed Plaintiff to be placed in the Lanzas therapeutic foster home without proper current approvals and then ordered her removal because the proper current approvals from FSTP and CRC were not in the file.

355.   Defendant LATTANE also allowed Plaintiff to be placed at the Marshall Group Home, which at the time of Plaintiff's placement, was being investigated because of allegations of domestic violence and poor supervision. She had knowledge that Plaintiff was exposed to a substantial risk of serious harm.

356.    At times relevant hereto, Defendant LATTANE, as supervisor of the placement unit, was aware that Plaintiff's mental health was continuing to deteriorate, that she was now in legal trouble, that she had repeatedly run away, that she had been raped, and that while on the streets she had contracted a number of sexually transmitted diseases and that Plaintiff was at a substantial risk of serious harm unless placed in a therapeutic foster home.

357.    As a direct result of the failure to place Plaintiff in a therapeutic foster home, Plaintiff began a long and painful series of placements in locked mental health facilities in which she was further physically, sexually and mentally abused.

358.    At times relevant hereto, Defendant LATTANE was deliberately indifferent to the safety and welfare of the Plaintiff as evidenced by her failure to respond to caseworker Bree Thompson's repeated requests that Plaintiff be placed in a therapeutic foster home and by her approval of placing Plaintiff, who was mentally deteriorating, in the Marshall home when that home was under active investigation for domestic violence and lack of supervision.

359.    Specifically, Defendant LATTANE was aware that Plaintiff, R.J., was at substantial risk of harm of neglect and physical abuse unless placed in a therapeutic foster home.

360.    Defendant LATTANE violated Plaintiff R.J.'s fundamental right of physical safety by authorizing unsafe placements and failing to properly obtain safe placement for Plaintiff, thus subjecting R.J. to a heightened risk of danger and caused her to be repeatedly abused.

361.    Defendant LATTANE violated Plaintiff's fundamental right of physical safety by allowing her mental health to deteriorate without following the recommendations of the professionals providing evaluation and treatment to the Plaintiff and by making no effort to properly and permanently place R.J. in the least restrictive environment in which her significant

mental health needs could be met.

362.    Defendant LATTANE acted in total disregard of the constitutional rights of the Plaintiff.

363.    Defendant LATTANE's actions were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights.  At all times relevant hereto, it was clearly established that children in the physical custody of the state foster care system had the right to be safe and free from unreasonable risk of harm

364.    As a result of Defendant LATTANE's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages.  Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

365.    Plaintiff R.J. is obligated to the undersigned firm for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C §1988.

WHEREFORE the Plaintiff, R.J. prays that this Honorable Court enter a judgment against Defendant LATTANE for all the recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## COUNT X -42 U.S.C. §1983 – DEFENDANT RAMSEY

366.    Plaintiff hereby reavers and realleges paragraphs 1 through 5, 46 through 48, and 49 through 237 as if fully set forth herein.

367.    At all times relevant hereto, Defendant RAMSEY knew that R.J. was a minor, in the custody of DCF, and a patient in a mental health facility.  At all times Defendant RAMSEY

knew that Vykie Young, the alleged perpetrator, was a staff member of the mental health facility where Plaintiff was a patient. At all times Defendant RAMSEY knew that it was illegal for staff members at mental health facilities to sexually engage patients in those facilities.

368. At all times relevant hereto, Defendant RAMSEY knew that patients who made allegations such as those made by R.J., if left at the institution, would be subject to pressure and harassment directed at having them recant, and unreasonable risk of harm.

369. At all times relevant hereto Defendant RAMSEY was aware that if the Plaintiff was indeed sexually abused by the alleged perpetrator, then she was at a substantial risk of serious harm from him.

370. At all times relevant hereto, Defendant RAMSEY was deliberately indifferent to the safety and welfare of the Plaintiff by allowing Plaintiff to remain at CATS during the pendency of the investigation where she was at a substantial risk of serious harm.

371. Specifically, in March 1999, Defendant RAMSEY was aware that Plaintiff R.J. was at substantial risk of harm of sexual abuse by Mr. Young and that she was at substantial risk of mental and physical harassment by other staff members at CATS.

372. Defendant RAMSEY violated Plaintiff R.J.'s fundamental right of physical safety by leaving her in an unsafe place that subjected Plaintiff R.J. to a heightened risk of danger and caused her to be repeatedly abused and violated.

373. Defendant RAMSEY acted in total disregard of the constitutional rights of the Plaintiff.

374. Defendant RAMSEY's actions, were with knowledge that said actions would deprive Plaintiff R.J. of her constitutional rights. At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the right be safe and free

61

from unreasonable risk of harm.

375.    As a result of Defendant RAMSEY's deliberate indifference, Plaintiff R.J. has suffered physical injury and psychological trauma, pain and suffering, discomfort, deterioration, disfigurement, loss of the ability to enjoy life, and suffered other reasonably foreseeable compensatory damages. Plaintiff R.J. will require services and treatment for the rest of her life due to the severe psychological trauma and other harm she has endured while in state care.

376.    Plaintiff R.J. is obligated to the undersigned firms for the payment of attorney's fees and seeks recovery of reasonable attorney's fees pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE the Plaintiff R.J. prays that this Honorable Court enter a judgment in her favor against Defendant RAMSEY, for all recoverable damages, attorneys' fees and costs and such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable in this case.

COLODNY, FASS, TALENFELD
KARLINSKY & ABATEM P.A.
Attorneys for Plaintiff
100 SE 3rd Ave., Fl 23
Fort Lauderdale, Florida 33394-0002
Telephone: (954) 492-4010
Fax:        (954) 492-1144
htalenfeld@cftlaw.com

by

Howard M. Talenfeld
Fla. Bar No. 312398

4/20/09

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

R. J.

**DEFENDANTS**

ANDREA AZIA a/k/a ANDREA ASIA, individually; EFRAM ROBERTS, individually; MARIA GONZALEZ, individually; +

**(b)** County of Residence of First Listed Plaintiff  Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Howard Mark Talenfeld
COLODNY FASS TALENFELD KARLINSKY & ABATE, P.A.
One Financial Plaza
100 S.E. 3rd Avenue +

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

1'09CV 21043- Seitz-O'Sullivan

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | Under Equal Access to Justice |
| | Employment | ☐ 550 Civil Rights | Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | ☐ 950 Constitutionality of State |
| | Other | | Detainee | | Statutes |
| | ☑ 440 Other Civil Rights | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO

JUDGE _____    DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Section 1983 - Allegations of caretaker and foster care abuse to the Plaintiff

LENGTH OF TRIAL via  15  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD _____

DATE  4/20/09

FOR OFFICE USE ONLY
AMOUNT  350 00    RECEIPT #  546066  IFP